### CONWAY v. SAME.

[See 17 Fed. 653.]

---

PHETTEPLACE (PARKER v.). See Case No. 10,746.

---

## Case No. 11,083.

### PHETTIPLACE v. SAYLES et al.

[4 Mason, 312.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1826.

INSOLVENCY—WHAT AMOUNTS TO REPRESENTATION AS TO PROPERTY—FRAUDULENT CONVEYANCE—RELEASE—RE-EXAMINATION OF WITNESS AFTER CLOSE OF DEPOSITION.

1. If a release be given by a creditor to a debtor, where he has been misled by a fraudulent misrepresentation, or other artifice of his debtor, the release may be set aside in equity. But the mere fact that the debtor had made a previous assignment of property, which would be fraudulent as to creditors, if known to the creditor, or if not intended to mislead him, will not alone work such an effect.

[Cited in Benter v. Patch, 18 D. C. 592; Richards v. Hunt, 6 Vt. 255; Reynolds v. French, 8 Vt. 88.]

2. What circumstances amount to a misrepresentation.

3. Where a party applies for, and attains the benefit of an act of insolvency upon his petition and representation of such insolvency, and a statement of what his property is; such statement is a representation to all his creditors, that it contains all his property, and is made in good faith.

4. What circumstances are presumptive of a conveyance being fraudulent as to creditors; want of possession of real estate is not, as it is of personal estate, a presumption of fraud.

[Cited in Almy v. Wilbur, Case No. 256; Re Hussman, Id. 6,951; Crawford v. Neal, 144 U. S. 585, 12 Sup. Ct. 763.]

[Cited in Hempstead v. Johnston, 18 Ark. 123; Quill v. Wolfe, 4 D. C. 190; Shaw v. Thompson, 43 N. H. 132.]

5. In chancery, where the deposition of a witness has been once taken and closed, it is not the practice to allow him to be re-examined without an order of court, and then only upon good cause shown.

---

1 [Reported by William P. Mason, Esq.]

[This was a bill in equity by Ebenezer Phettiplace against Daniel Sayles and Hardin Sayles, for relief.]

Mr. Steere, for plaintiff.
Whipple & Tibbetts, for defendants.

STORY, Circuit Justice. This is a suit in equity, brought by the plaintiff, a judgment creditor of the defendant, Daniel Sayles, to set aside a release and composition discharging the debt, and to obtain other relief against the judgment debtor, and also against his son, the co-defendant, Hardin Sayles, as the asserted owner of certain real and personal estate of his father, under a conveyance made to defraud creditors. The circumstances of the case are as follows: The plaintiff commenced suits for the recovery of the debts due him from the defendant, Daniel Sayles, in May, 1817, and obtained judgment thereon at December term of the court of common pleas, in the same year. On the first day of the same month, and pending the suits, the defendant, Daniel Sayles, conveyed to one Cyrus Sayles (his nephew), in fee simple for the asserted consideration of $1,000, the farm on which he (the defendant) then lived, and has ever since continued to live, with the dwelling-house, barn, mill, &c. thereon, and also a wood lot of about 20 acres. On the 13th of March, 1818, Daniel Sayles conveyed certain real and personal estate therein mentioned (not including that conveyed to Cyrus Sayles), to one John Wood, in trust to sell the same, and to distribute the proceeds among certain scheduled creditors (including the plaintiff), who should accept the assignment, with a proviso, that the conveyance should be void, unless the creditors to one third of the amount of the debts should accept the same in writing. and discharge him from their debts. In April, 1818, Daniel Sayles being in gaol on execution by some of his creditors, filed a petition to the general assembly of Rhode Island, praying for the benefit of the insolvent law of that state. In this petition he sets forth that he has nothing to offer as an inventory of property but his wearing apparel, his "property being all assigned for the benefit of all the creditors who may choose to accept the same." The petition was granted by the general assembly at its June session, 1818, and the petitioner having, in the mean time, on the 8th of May, been committed on executions, which issued on the plaintiff's judgments against him, was in the usual manner discharged therefrom under the insolvent law. An instrument of release bearing date the same day with the assignment to Wood, and reciting the purport of it, was executed by the scheduled creditors, and among others by the plaintiff, accepting the assignment, and upon payment of their distributive shares (which have been received), discharging their debts. The plaintiff did not sign this instrument until after the debtor was discharged under the insolv-

ent act. There is an allegation in the bill, that the debtor also conveyed real estate and personal estate to the amount of $1,500 to his son Hardin, to defraud his creditors. But neither the answers nor the evidence take any, even the slightest notice of this matter, and it was abandoned at the argument.

The bill, after stating the substance of these facts, proceeds to charge, that the plaintiff signed the release, believing that the assignment was an honest assignment of all the debtor's property, "and at the time the creditors signed said release, and took said assignment, the said Daniel represented said assignment to contain all his property of every kind, and fraudulently concealed said real estate and personal property from them, and that the creditors, and especially the plaintiff, was ignorant of the said Daniel's owning this property, confided in his said representation, and thereupon, and so confiding in the same, signed said release." This is the charge laid to invalidate the release; and although the charge is not made with technical precision and accuracy (and indeed in many respects the bill is inartificially drawn); yet I think that it is sufficient, if proved, to require from the court a decree which shall declare the release a nullity. A deed procured by a fraudulent misrepresentation, cannot be permitted to have the slightest validity to bar rights in a court of equity. The bill then proceeds to state, that Enoch Steere, another of the releasing creditors, has assigned his debt to the plaintiff. But no facts are stated as to the time when the assignment was made, nor whether it be such as can, with the limited jurisdiction of this court, under the eleventh section of the judiciary act of 1789, c. 20, be maintained in this court; nor even any allegation that there has been any fraud in respect to this debt, either on the creditor or the assignee. We may therefore dismiss all consideration of this part of the bill as utterly inadmissible for any purpose of relief. The bill then proceeds to state, that Cyrus Sayles, in December, 1819, by his deed (which is in fact a mere release), conveyed the same farm and lot of land to Hardin Sayles for the pretended consideration of $1,100, but in fact for the same purpose of defrauding the creditors of Daniel Sayles, and that he is now in possession thereof. It charges that Hardin was a party and privy to the original fraud upon the creditors, and took an active agency in the transactions, and that the defendants are now in possession of property of Daniel Sayles more than sufficient to pay all his debts. The prayer of the bill is for general relief. The defendants, by their answers, expressly deny any fraud; and assert that the conveyances to Cyrus Sayles, and from him to Hardin, were made for a valuable consideration and bona fide; and that there was not any fraudulent misrepresentation by the debtor to obtain the release, as suggested in the bill. The general replication hav-

ing been filed, the cause has been argued upon the whole evidence in the case, and is indeed principally a question of fact.

The first question for consideration is, whether there has been, on the part of the debtor, any fraudulent misrepresentation to procure the release. I agree to the doctrine, that the mere fact that the debtor had previously made a fraudulent conveyance, is not of itself sufficient to set aside the release. If the creditor knew of such conveyance, there is no pretence to say, that he would not be bound by his release, for he would act with his eyes open. And if he is wholly ignorant of it, and gives a release without any artifice to mislead him, or any attempt to make the property assigned appear to be the whole property of the debtor, it would be going a great way to affirm, that he would be entitled to relief, if upon more reflection and better advice he should find that he had concluded an unfavorable bargain. But if there be a concealment of property or a fraudulent conveyance by the debtor, with intent to mislead the creditor, and under such circumstances the creditor, trusting to the good faith and honesty of his debtor, signs a release, I should be sorry, that at least in a court of equity, there might not be found sufficient morals in the law to defeat such overreaching baseness. A fortiori an actual or direct misrepresentation ought to have this effect.

It has been further argued, that the assignment to Wood was fraudulent, because it stipulated for benefits on the part of the debtor, which he had no right to demand. I agree that it would be so in relation to creditors, who should not choose to come in and confirm it. But except as to such creditors, it would certainly be valid; for it is competent for other creditors to waive their rights; and it is impossible that there can be any fraud upon those who deliberately, voluntarily, and with knowledge of all the facts, assent to the terms of the debtor. The whole question, therefore, turns upon the point of misrepresentation to the creditors who have signed the release.

Now what are the circumstances of the present case? It is said, that there is no proof that the debtor ever did represent that the property assigned to Wood was his whole property, as an inducement to the release. That is true, if by proof is intended a personal, direct, and unequivocal declaration. But are not the facts in evidence tantamount to such a declaration? The assignment was made to Wood in March, and the petition to the legislature in the succeeding April. That petition contains an express affirmation, on oath, that the party had no property except his wearing apparel, which had not been assigned for the benefit of all his creditors. This was in no sense a private document; but a public representation as well to all his creditors, as to the legislature, of the actual posture of his affairs. Upon the faith of

this document, the legislature granted him the benefit of the insolvent act, and thereby discharged him from imprisonment under the executions of his creditors, and particularly of the plaintiff. The act went farther, and presuming a rightful legislative authority, it undertook to discharge the party from all the debts of all his creditors. Every creditor might be presumed to be conusant of public representations and acts so vitally affecting his own rights and interests. And what is most material to the case, the plaintiff did not sign the release or accept of the assignment to Wood, until after these transactions were past and notorious. The plaintiff must therefore be presumed to have known the facts stated in the petition, and to have acted under the most entire reliance upon the good faith of the party. The defence of the debtor himself does not attempt to impeach this conclusion. On the contrary, his answer asserts that the assignment to Wood "was a fair and honest assignment of all the real and personal estate of every kind and nature belonging to" him, and that he "delivered to the said Wood, under said assignment, all and every part and kind of property belonging to him, or to which he had any claim or title, and received from his said creditors the release and discharge stated in said bill, and which he now relies upon as a defence against the unjust claim of the complainant;" and he proceeds to deny "that at the time of making said assignment, and obtaining said discharge, he made any false representations as to his insolvency, the amount of his debts, or property, or that he in any way deceived any of his creditors in regard to his ability to pay his debts, but that said discharge was voluntarily executed by said creditors." The plain import of all this is, that he had made no fraudulent conveyance of his property; that his representation was therefore true, and that his creditors under the assignment to Wood, were entitled to have, and in fact had, the full benefit of all his property. If this be so, then the release ought to stand; if otherwise, then upon principles of common justice it ought to be set aside.

The material question, therefore, is, whether the debtor had at this time made a fraudulent conveyance of real or personal estate for the purpose of cheating his creditors. I say of real or personal estate, for it is sufficient if either existed, since to the extent of the property so concealed or subducted, there was a fraud upon the creditors, and a misrepresentation of the debtor vitally affecting the release. Two conveyances are relied upon by the plaintiff as fraudulent: First, the conveyance of the farm to Cyrus Sayles; secondly, the conveyance of personal property to Polly Smith.

And first, as to the conveyance of the farm to Cyrus Sayles. This was made on the first day of December, 1817, a short time before the judgments obtained by the plaintiff, and for the asserted consideration of $1,000. The debtor was, at this time, beyond all question, insolvent, and in a few months afterwards, applied for the benefit of the insolvent act. He notwithstanding possessed a right to sell the farm, or any other property for a full and valuable consideration, and bonâ fide to any person whatsoever. He might sell to his nephew as well as to any other person, although such a sale by an insolvent debtor to a relation, would naturally excite more suspicion than a sale to a mere stranger. Still if bonâ fide made, for a fair consideration, and without any design to defraud creditors, the sale would be entirely valid in point of law. So the debtor had a perfect right to prefer one creditor to another; to pay one and omit to pay another; to give security to one and refuse it to another; and a previous debt would be just as good a consideration to uphold a sale, as money paid at the moment. All that the law requires in such cases, is good faith and honest intentions between the parties. If there be bad faith, or an intention to defraud creditors, no consideration, however valuable, will give effect to the deed against third persons, who are injured by it. As to them, it is utterly void and unsupportable. The manner, in which the consideration was paid by Cyrus Sayles, is stated in the answers to be as follows: First, about $400 due on an antecedent mortgage of the estate to one John Arnold, and paid by Cyrus Sayles; secondly, a debt due upon notes of the grantor to Cyrus Sayles himself, for work and labour of about $375; thirdly, a debt due to one Ziba Whipple by the grantor, and paid by Cyrus Sayles; and, lastly, the balance in money paid to the grantor. These statements being responsive to the matter of the bill, in its charges and interrogatories, is evidence in favour of the defendants; and if they are not overturned by counterproofs or circumstances, they are decisive on this point. The burthen of proof of fraud, indeed, rests on the plaintiff; and the fraud being explicitly disavowed by the answers, the plaintiff must maintain the suit by his own strength. This, then, being the posture of the case, it is necessary to consider whether the circumstances relied on as presumptive of fraud are of such a nature as ought to outweigh the positive denials of the answers. It is not sufficient for the plaintiff to show circumstances of suspicion or doubt, or even of inflamed suspicion or doubt. Nor is it sufficient to establish contradictions in the testimony of either party, which might induce the court to pause or hesitate, as to the side on which the truth lies. He must go farther, and establish beyond a reasonable doubt, that the weight of evidence and circumstances is so decisively in his favour, as to destroy the ordinary credit of the answers.

There are some facts in the case which are not disputed, and indeed are incontrovertibly proved. One is, that at the time of the conveyance, Daniel Sayles was bonâ fide indebt-

ed to Cyrus in a sum exceeding $300, and probably from $375 to $400. Another is, that there was due to John Arnold on his mortgage, upwards of $400, which was secured and finally paid to him by Cyrus. The weight of evidence also is, and it is positively sworn by Ziba Whipple, that a debt of Daniel of about $100 was transferred by him (Ziba) to Cyrus, and formed a part consideration of the conveyance. A small sum of money, not probably exceeding $100, appears to have been paid by Cyrus to Daniel at the time of the execution of the deed. It may be taken also as a fact, that the farm was not at the time worth more than $1,000. There is some testimony in the cause to establish a higher value; but it is encountered by stronger testimony on the other side; and the argument itself does not affect to place much reliance on a supposed undervaluation to discredit the sale. Indeed, considering that there was no release of the wife's dower, and that the time of the sale was a period of great depression, it would be very difficult upon the proofs to doubt, that if bonâ fide, the sale was for the full value of the estate. What then are the circumstances, on which the plaintiff relies, to establish a fraud in the face of these facts? At most, the excess of value, beyond debts actually extinguished or provided for, did not reach $200; and the whole machinery of fraud must have been deliberately got up to cover an insignificant sum, such as would not commonly tempt a party to very extraordinary subterfuges and evasion.

One circumstance, on which the plaintiff relies, is, that Cyrus Sayles, in one of the three depositions given by him as a witness, has asserted, that three fictitious notes were made by Daniel to him, antecedently to the conveyance, for the purpose of swelling the balance due to him, so as to cover all the purchase money. If this statement were confirmed by the proofs, it would be entitled to very great weight in the cause. But there is some difficulty in admitting it. 'The deposition, here alluded to, was taken in another and prior cause, pending in another court, and not in the present cause. It forms no direct and positive proof of itself, and can be used in no other manner than to affect the credibility of the other testimony of the witness. The plaintiff himself, in February, 1825, took the deposition of the witness, under a commission, as evidence in this cause, and the defendants, on that occasion, cross examined him. It is certainly not for the plaintiff, under such circumstances, to impeach the credibility of his own witness. The most, that he is entitled to do, is to substantiate, by other witnesses, any material facts, which that witness has misstated. Afterwards, in June, 1825, the defendants, without any order or leave of the court, took the deposition of the same witness, under the same commission, and the plaintiff, on that occasion, on his cross examination, brought out the fact of the first deposi-

tion, and procured a verified copy of the same to be annexed to the cross examination. The magistrate, before whom it was taken, has also proved the original. It is in this manner, that the first deposition has found its way into the cause. An objection has been taken by the plaintiff to the use of the third deposition upon the ground, that, after the first examination of the witness was completely closed on each side, it was irregular to re-examine him without an order of the court. It is certainly the practice of the court of chancery not to allow a witness, whose examination has been once taken and closed, to be re-examined without an order of the court, and then only upon good cause shown. Wyatt, Pract. Reg. 420; Harris, Ch. Prac. p. 273, c. 42; 2 Ch. Cas. 217: Sawyer v. Bowyer, 1 Brown, Ch. 388; Sandford v. Paul, 1 Ves. Jr. 399; Kirk v. Kirk, 13 Ves. 280, 285. The reason assigned for the rule is, to prevent perjuries, and tampering with witnesses, after the pressure of the evidence is known. I think the practice a salutary one; and shall adhere to it on this occasion, and direct a suppression of the third deposition. The first deposition would still be in the cause, as it is regularly before the court, by the testimony of the officiating magistrate; but the difficulty is, that it is not evidence in chief, and can be used only to discredit the witness by a party entitled to use it for that purpose. The plaintiff, having taken and used his testimony, is certainly not in this predicament. The only deposition of the witness, then, which can be examined by the court, is the second, and that is so far from supporting the plaintiff's allegations, that, if it be entitled to credit, it comports mainly with the defence. It is, too, corroborated by the testimony of the magistrate, before whom the deed of Daniel Sayles to Cyrus Sayles was executed and acknowledged.

Another circumstance, relied on to invalidate the good faith of this conveyance, is, that no change of possession took place, but the grantor continued in possession notwithstanding the sale, and occupied the farm as he had been accustomed to do. This circumstance is not without weight, and in a doubtful case would incline the court not to yield any just suspicions, arising from other causes. But possession, after a sale of real estate, does not per se raise a presumption of fraud, as it does in the case of personal estate. In the latter case, possession is primâ facie evidence of ownership, and where a party, who is owner, sells personal property absolutely, and yet continues to retain the visible and exclusive possession, the law deems such conduct a constructive fraud upon the public, and the sale, as to creditors, wholly inoperative, whether it be for a valuable consideration or not. This doctrine has its foundation in a great public policy, to protect creditors against secret, collusive transfers. The same rule does not apply to real estates. Possession is not here deemed

evidence of ownership. The laws of most civilized nations require solemn instruments to pass the title to real property; and in Rhode Island, as in most of the states in the Union, a deed executed with due formalities, and acknowledged before a magistrate, and recorded in the public registry, is indispensable to make a perfect transfer of real estate. The public look not so much to possession as to the public records, as proofs of the title to such property. The possession, therefore, must be inconsistent with the sale, and repugnant to it in terms or operation, before it raises a just presumption of fraud. Now, in the present case, there is nothing of this nature. Admitting that there was an understanding, that if Daniel Sayles should be able he might re-purchase the estate, at a future time, by paying a sum equal to the original price, there is nothing fraudulent in such an agreement. If bonâ fide made, by parol or in writing, there is nothing in law or morals, that repudiates it. Then as to the possession of Daniel, during the succeeding winter, that would not be an unusual indulgence granted upon any sale. There is no pretence to say, that the conveyance was, for a moment, kept secret. It was put on record as soon as it was executed, and became notorious. The subsequent lease to Hardin Sayles, under which he and his father remained in possession, until the sale to him in May, 1819, at a stipulated rent, is certainly compatible with a real and bonâ fide change of the ownership.

But it is argued that the sale itself to Hardin Sayles is evidence, that the sale originally made to Cyrus Sayles was merely nominal. First, it is said, that this second sale was originally contemplated by the parties. But in what manner? It was solely upon the ground, that Hardin should be able to pay to Cyrus a full consideration for it. There is certainly nothing unnatural, immoral, or illegal, in a son's wishing to re-purchase for his father the family estate, which the latter is compelled to sell. And if the purchaser is willing to accede to such an agreement, I am not prepared to admit, that a transaction, otherwise bonâ fide, would be tainted by it. The most that can be said is, that it may justly be deemed a circumstance corroborative of marked badges of fraud; but of itself it cannot create a fraud. Then again, it is urged that Hardin Sayles was a young man, without family and without property, and therefore not likely to make such a purchase, or to be credited for it on his own account. It appears, however, that though just of age, he was enabled, from his industrious habits, to obtain credit, and that he has since been pursuing a profitable business, by which he has discharged the whole purchase money for the estate. It is not unnatural, that he should, from filial affection, have been willing to incur considerable personal responsibility to save his parent, with whom he lived, from absolute ruin and suffering. I agree, that his conduct should, under such circumstances, be closely watched; but taking the whole evidence together, I cannot say, that there is anything, after his purchase, to lead to any just question of his being a fair purchaser on his own account, and not a mere trustee, acting in fandem legis, for the benefit of his father. The acts and language of his father, in respect to the farm, after the purchase, are quite consistent with the absence of any farther interest than age, experience, and the ascendency of the parental character would ordinarily imply. If, however, his acts and language should be thought to raise some doubts, still it is to be remembered, that, in a case like the present, doubts are not sufficient to justify a decree for the plaintiff.

I pass over all particular notice of the sale of the cotton goods, supposed, but not proved, to have been the property of Cyrus Sayles, and of the application of the proceeds towards the payment of the mortgage of John Arnold, because I am not satisfied by the evidence, that this payment originally constituted a part of the agreement on the sale to Cyrus Sayles, nor that, when applied, it was not a debt incurred by Cyrus to Hardin Sayles. I do not say, that the transaction is free of doubt; but it is susceptible of different explanations, and my mind does not repose with confidence on it. It certainly ought not to outweigh the positive denials of the answers of both of the defendants, as to the integrity and good faith of both conveyances. There are other circumstances, upon which I might comment; but they are far more slight than those which have been mentioned. The court cannot feel itself at liberty to set aside deeds of real estate upon the ground of fraud, unless that fraud is manifest beyond a reasonable doubt. It is not to substitute conjecture for proof; nor suspicion for plain, direct, positive presumption.

2. It remains to examine the conveyance of personal property by Daniel Sayles to Polly Smith. That the grantor was truly indebted to the grantee, in the full amount of the consideration stated in the bill of sale, is not denied, and indeed, upon the evidence, admits of no dispute. That the personal property so conveyed, consisting partly of stock of the farm, and partly of household furniture, was left in the absolute possession of the grantor, is not disputed. Under such circumstances, even if bonâ fide made between the parties, it was, in contemplation of law, as I have already stated, void as to creditors; but between the parties themselves it was undoubtedly valid. It is clear, that there was no intention to cheat the creditors by a pretended sale, or by any secret contrivance whatsoever. The parties evidently acted upon a misconception of the law, from sheer ignorance, and not from guile. How else shall we account for the fact, that the notes for the debt were given up, and a perfect confidence placed in this bill of sale, not as a sufficient, but as a legal and the only indemnity which the party

could give. There is no evidence which establishes, that the property was equal in value to the amount of the debt; and as far as it goes, the evidence strongly inclines the other way. If, then, between the parties this was a good bill of sale, however ineffectual it might be against creditors, if they chose to enforce their rights, what ground is there for the court to say, that the omission, by Daniel Sayles, to include this property in his inventory, was a fraudulent misrepresentation? The bill of sale was not void, but only voidable; not voidable by himself, but by his creditors only. It seems to me, that it would be going very far for a court to hold, that a bill of sale, merely constructively fraudulent, and which the party himself in honor and honesty could not contest, was yet property which he was bound to include in his inventory as his own property. My judgment is, that a transaction, innocently intended, but failing, from the ignorance of the parties, to effectuate their object, ought not to receive such an interpretation.

Upon the whole, my judgment is, that the present bill is not, upon the evidence, sustained in its material allegations, and therefore it ought to be dismissed; but I do not think it a case for costs. The district judge concurs in this opinion, and therefore there is to be a decree of dismissal.

Decree accordingly.